IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DONAVAN TROY FORTIN,                          Case No. 3:07-cv-00633-PK

                    Petitioner,                          FINDINGS AND
         v.                                              RECOMMENDATION

MARK NOOTH,

                    Respondent.

———————————————————

**PAPAK, Magistrate Judge:**

Petitioner brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254, challenging

his 2002 conviction for Rape, Sexual Abuse, Attempted Sexual Abuse, and Coercion. For the

reasons set forth below, Petitioner's Second Amended Habeas Petition (ECF No. 92) should be

denied, and judgment should be entered dismissing this action with prejudice.

## BACKGROUND

On December 20, 2001, thirteen-year-old SD reported to Patrol Officer Kenneth Real that,

while she was a babysitter for Petitioner, he kissed her, fondled her breasts, and tried to touch her

genital area. Resp't Ex. 112 at 2, 4. Petitioner was arrested and charged with Sexual Abuse in the

Third Degree. *Id.* at 2. According to Real, after advising Petitioner of his *Miranda* rights, Petitioner

made the following statements about SD, as well as sixteen-year-old AV (who also babysat for him):

> FORTIN said that over a year ago he had kissed [AV] and he had told her mother
> about it. * * *
>
> I asked FORTIN about [SD] and he said "I'll tell you I have nothing to hide, so I
> kissed her and fondled her breasts, its not like I raped her." I asked FORTIN to tell
> me how it started FORTIN said [SD] has been his childrens babysitter for about a
> year, about late last summer he started doing things with [SD].
>
> When I asked what things he said "kissing and touching, ask [SD] she can tell you
> I admit to it." I told FORTIN [SD] had said he tried to touch her genital area but
> stopped when she told him to. FORTIN replied "Yeh I tried but when she said stop
> I stopped I know what no means." FORTIN said "I am not trying to make myself
> look better but she always came back to baby-sit my kids." I asked FORTIN if he
> ever threatened [SD] he said we "never talked about our little secret and it was kind
> of a relationship."
>
> I asked what kind of a relationship FORTIN said "a little bit of a relationship not like
> the one I have with my wife." FORTIN ended the interview by saying "It happened
> I cannot say anything about that. I wasn't molesting her but she's 13 and I am 29
> . . . ."

*Id.* at 5.

On February 3, 2002, Officer Real interviewed AV and she revealed that Petitioner had raped

her in the living room of his house. *Id.* at 7. On February 5, 2002, Officer Real interviewed SD and

she stated that Petitioner had raped her twice. *Id.* According to Officer Real's incident report, SD

stated the second rape occurred in Petitioner's car on November 10, 2001. *Id.* Social Worker Debra

Fausett indicated in her forensic interview report, however, that SD did not know the date when the

second rape occurred, but stated "that she was 13 or 12, like that she had just turned 13." Resp't Ex.

110 at 1.

On May 29, 2002, a grand jury indicted Petitioner on additional counts of Rape, Sexual

Abuse, Attempted Sexual Abuse, and Coercion. Resp't Ex. 102. At trial, the prosecution offered the

testimony of both victims, the victims' mothers, Officer Real, an expert witness, two social workers, and Petitioner's friend Brad Beggs. The prosecution also offered into evidence recorded interviews of SD and AV (taken at the Children's Advocacy Center), and Petitioner's statements to police.

SD testified that Petitioner touched her breasts several times, tried to put his hands down her pants, and raped her twice. Tr. (ECF No. 22) at 102-124. She testified that she was thirteen when Petitioner raped her, and that she did not report the rapes sooner because Petitioner threatened to kill her and her family. *Id.* at 113-21, 132. SD testified that she did not know the precise dates the rapes occurred, and she did not believe she gave specific dates to Officer Real (although he told her she needed to). *Id.* at 111, 130-31. AV testified that Petitioner tried to put his hands down her pants twice, and raped her in his house. *Id.* at 379-87. According to AV, she was fourteen when Petitioner raped her, and she did not report the rape sooner because Petitioner threatened to kill her and her family. *Id.* at 376-78, 386-89.

Petitioner testified in his own defense. Petitioner admitted to having consensual sex with AV, but denied any improper behavior with SD. *Id.* at 501-18. Regarding his incriminating statements to Officer Real, Petitioner testified that he did not confess to any improper conduct toward SD, but instead was speaking exclusively about AV. *Id.* at 520-24. Petitioner called several witnesses who testified that (1) Petitioner was out of town on November 10, 2001 (one of the dates SD allegedly told Officer Real that Petitioner raped her); and (2) AV and SD did not appear to be afraid of Petitioner. Petitioner also recalled Officer Real and AV. On cross examination, Officer Real reiterated that SD did not provide precise dates for the rapes. *Id.* at 448-49. During closing arguments, defense counsel argued that Petitioner was guilty only of the statutory rape of AV, and that Detective Real committed perjury when he testified that SD did not specify the dates Petitioner raped her, and when he recounted the incriminating statements allegedly made by Petitioner.

The jury convicted Petitioner of all charges involving SD (Rape in the First Degree (two counts), Rape in the Second Degree (two counts), Sexual Abuse in the First Degree (four counts), Attempted Sexual Abuse in the First Degree (one count), and Coercion (one count)). Resp't Ex. 101. With regard to the charges involving AV, the jury convicted Petitioner of Rape in the Third Degree (one count), Sexual Abuse in the Third Degree (one count), and Attempted Sexual Abuse in the Third Degree (two counts), but acquitted him of Rape in the First Degree and Coercion. Resp't Exs. 101, 102. The trial court sentenced Petitioner to a 404-month term of imprisonment. *See* Resp't Exs. 101, 104 at 3.

Petitioner appealed his conviction and sentence, but later voluntarily dismissed the appeal. Resp't Ex. 103. Petitioner sought state post-conviction relief (PCR) alleging that trial counsel was ineffective on multiple grounds, including (1) failing to hire a forensic expert to rebut testimony that delayed disclosure by sex abuse victims is common; (2) failing to call Petitioner's mother and wife as witnesses; and (3) confusing the names of the victims during trial. Resp't Ex. 104 at 4-5. The PCR court denied relief. Resp't Ex. 119 at 54. The Oregon Court of Appeals affirmed, without written opinion, and the Oregon Supreme Court denied review. *Fortin v. Hill*, 151 P.3d 960 (Or.App.), *rev. denied*, 155 P.3d 874 (Or. 2007).

In 2010, during the course of this proceeding, Petitioner filed a second state PCR proceeding alleging that (1) the prosecutor allowed SD to give perjured testimony; (2) the prosecutor failed to disclose *Brady* material; and (3) he is actually innocent. Resp't Ex. 126 at 2. In support of his second PCR petition, Petitioner offered the transcript of an October 13, 2009 interview of SD conducted by Harold Nash (Petitioner's private investigator), and Ron Benson (a Lincoln County District Attorney's Office investigator). Resp't Exs. 127, 129, 130. During that interview, SD recanted her trial testimony and stated that her sexual contact with Petitioner was consensual. The PCR court

denied relief, the Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court

denied review. *Fortin v. Nooth*, 326 P.3d 1289 (Or. App.), *rev. denied*, 355 P.3d 668 (Or. 2014).

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254(d), a petition for writ of habeas corpus filed by a state prisoner

shall not be granted, with respect to any claim that was adjudicated on the merits in state court,

unless the adjudication resulted in a decision that was "contrary to, or involved an unreasonable

application of, clearly established Federal law," or "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1)

& (2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *White v. Woodall*, 134 S.Ct. 1697, 1702

(2014).

A state court unreasonably applies clearly established federal law, if its decision is "so

lacking in justification that there was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *Woodall*, 134 S.Ct.

at 1702. A state court's factual determination is not unreasonable merely because the federal habeas

court would reach a different conclusion in the first instance. *Brumfield v. Cain*, 135 S.Ct. 2269,

2277 (2015); *Burt v. Titlow*, 134 S.Ct. 10, 15 (2013). "Instead, § 2254(d)(2) requires that [this Court]

accord the state trial court substantial deference." *Brumfield*, 135 S.Ct. at 2277. If reasonable minds

reviewing the record might disagree about the finding in question, habeas relief is not warranted. *Id*

## DISCUSSION

**I.    INEFFECTIVE ASSISTANCE OF COUNSEL**

In Ground One of his Second Amended Petition, Petitioner alleges that trial counsel rendered

ineffective assistance of counsel by failing to (1) call Petitioner's wife and mother as witnesses;

(2) call a necessary expert witness; and (3) make an accurate and coherent closing argument. Pet'r's Second Am. Pet. at 3. Respondent moves this Court to deny habeas relief on the basis that the PCR court's rejection of these claims is entitled to deference under 28 U.S.C. § 2254(d).

The Supreme Court has established a two-part test to determine whether a petitioner has received ineffective assistance of counsel. First, the petitioner must show that his lawyer's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-687 (1984). This Court's review of counsel's assistance is "doubly deferential" in that this Court takes a highly deferential look at counsel's performance under the deferential lens of § 2254(d). *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011); *Zapien v. Martel*, 805 F.3d 862, 869 (9th Cir. 2015). When applying this deferential standard, it is not for this Court to second guess counsel's strategic decisions. *Strickland*, 466 U.S. at 689; *Zapien*, 805 F.3d at 872; *Elmore v. Sinclair*, 799 F.3d 1238, 1250 (9th Cir. 2015), *pet. for cert. filed* (Jan. 27, 2016) (No. 15-7848).

A petitioner also must show that his lawyer's performance prejudiced the defense. The test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id.* at 696. In evaluating proof of prejudice, this Court considers the totality of the evidence before the jury. *Id.* "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*

A. **Counsel's Failure to Call Petitioner's Wife and Mother as Witnesses**

Petitioner argues that defense counsel rendered ineffective assistance because he failed to call as witnesses Petitioner's wife, Cassandra Fortin, and his mother, Jessica Bayya Oliphant. Additionally, Petitioner complains that because trial counsel subpoenaed Petitioner's wife, but never

called her as a witness, she was precluded from attending the trial (leading the jury to believe that she did not support her husband).[1] At the PCR proceeding, Petitioner offered affidavits by his wife and mother which he argued countered testimony by AV, SD, and SD's mother concerning the layout of Petitioner's house, the interior of his car, whether the victims were fearful of him, and whether Petitioner's mother made certain statements to SD's mother. *See* Resp't Exs. 107, 108.

Defense Counsel Scott Baldwin testified at the PCR proceeding that he did not call Petitioner's wife as a witness because he was concerned that she might be detrimental to Petitioner's defense:

> I had--had told [Petitioner] that I would prefer not to use her, and this is going to sound a little vague, but Mr. Nash, in doing investigation in Siletz, came under the impression that she might be motivated to hurt [Petitioner], and I understood that [Petitioner] did not see it that way. So my view was if there was something we had to have her for, I would use her, but if it was merely going to be to impeach . . . the witness or just to have his wife testify, then I viewed it as a risk.

* * * * *

> [I]t was before trial that Harold Nash came under the impression that, and I don't want to be too specific, that--that she might be wanting to hurt [Petitioner]. Not in terms of supporting one of the victims, but Harold seemed to think that she had something else going on that--that she might be motivated to hurt Troy. I mentioned that to him.[2] I think that upset him a little bit, but my view was I--I--to be honest with you, subtracting what I just said, I don't know what we would have used her for. She's not a (INAUDIBLE) witness certainly. I don't know if I'd put someone on for her to impeach her babysitters, being married to the defendant. So it's--it's not apparent to me. I think your--your question assumes that why would I not use her, and I guess I would ask why would I use her?

Resp't. Ex. 119 at 32, 42. Private Investigator Nash also recalled that there was concern that Petitioner's wife testimony could be harmful to the defense. *Id.* at 24.

---

[1] It is worthy of note that Petitioner's wife was in the courtroom after the state rested, and before Petitioner testified in his defense. *See* Tr. at 431.

[2] In his PCR deposition, Petitioner testified that Baldwin did not tell him why he did not call Petitioner's wife as a witness. Resp't Ex. 118 at 17.

Page 7 - FINDINGS AND RECOMMENDATION

Additionally, Baldwin testified that although Petitioner's mother provided useful information for the investigation, he believed she would be a poor witness:

> She provided us . . . with some very useful information. In particular, the statement from the high school teacher that puts [Petitioner] basically hanging out with [SD] after she'd supposedly been raped by him, I believe at her initiation. * * * It is the case that we did not want her to testify . . . unless absolutely necessary, and I didn't view it as being necessary mostly because she's very aggressive, I would say on the shrill side, and I thought she wouldn't come off well to the jury.

*Id.* at 32-33. Nash agreed with Baldwin's assessment of Petitioner's mother's demeanor. *Id.* at 21, 24.

Based on the foregoing, the PCR court denied relief because trial counsel's reasons for not calling Petitioner's wife and mother as witnesses were "plausible and reasonable," and trial counsel's performance was "entirely adequate:"

> [H]aving read the trial transcript, read the affidavits and all this, and listened to the testimony today, my belief is that what we have here is a valiant but unsuccessful attempt to turn gnats into dinosaurs, if you will. That the plausible and reasonable explanations for not calling the mother and the wife, if in fact they would say what they would have said . . . . You know, I don't remember who it was here said no, it's a "He said, she said." That's exactly what it is. And what you have is that the lawyer did the best he could do with what he had. The jury was obviously not confused in any degree given the kind--types of verdicts that they returned. There's just nothing here. . . . So I don't think there's a thing here. This man received entirely adequate assistance of counsel. He doesn't like the result. I'm sorry, but it's not the lawyer's fault, and it's not because he didn't receive an adequate defense. So the petition for post-conviction is denied.

*Id.* at 54-55.

Given the highly deferential standard of review under § 2254(d), and the Supreme Court's admonition that a habeas court not second guess trial counsel's strategic decisions, Petitioner has not demonstrated that trial counsel was ineffective for failing to call Cassandra Fortin or Jessica Bayya Oliphant as witnesses. In light of defense counsel's concerns that (1) Petitioner's wife might provide "hurtful" testimony; (2) Petitioner's mother's aggressive demeanor would not have "come off well

to the jury;" and (3) neither witness would have provided testimony critical to the defense, the strategic decision not to call the women as witnesses did not fall below an objective standard of reasonableness. Further, given the totality of the evidence presented as trial, Petitioner has not demonstrated that there is a reasonable probability that, had defense counsel called Petitioner's mother and/or wife as witnesses, the result of the proceeding would have been different. Accordingly, the PCR court's conclusion that trial counsel did not render ineffective assistance is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

### B.    Counsel's Failure to Retain an Expert

Petitioner contends that trial counsel rendered ineffective assistance by failing to retain an expert to rebut the state's expert's testimony that delayed reporting by sex abuse victims is common. He contends that delayed disclosure was a critical issue in his case and counsel should have followed up with an expert witness identified by Nash. At the PCR proceeding, however, neither Petitioner nor Nash specified what the expert would have testified to--other than to say he would have addressed the topic of delayed disclosure. *See* Resp't Ex. 118 at 10, Ex. 119 at 20.

Defense counsel, in contrast, testified that his decision not to call an expert witness was strategic, explaining that expert opinion testimony on delayed disclosure was not critical to Petitioner's defense:

> I didn't pursue an expert for, I think, two reasons. One was, certainly with regard to the older girl, we were arguing that was consensual sex and there was Rape I. With regard to the other victim, there was an alibi defense, and that's the whole date situation that became, let's say, fluid during the trial. The--I've typically used experts when it's a CARES interview of young children. And my view was in--with older kids here, again, they're essentially high school age, maybe upper junior high, at least at the time of the trial, my view was going after the interviews of them was not [where] the pay dirt was. It was more showing that there was an affair. Frankly, trying to prove there was an affair between [Petitioner] and the older girl. And with

Page 9 - FINDINGS AND RECOMMENDATION

regard to the younger girl, that she simply was not credible, and that one of the two incident dates she picked were impossible.

Resp't Ex. 119 at 39-40.

Given the highly deferential standard of review under § 2254(d), and the Supreme Court's admonition that a habeas court not second guess trial counsel's strategic decisions, Petitioner has not demonstrated trial counsel rendered ineffective assistance by failing to present expert testimony on the topic of delayed disclosure. Moreover, even assuming that counsel's performance was deficient, Petitioner has not shown that he was prejudiced by trial counsel's failure to retain an expert. Although Petitioner contends generally that an expert would have contradicted the state's expert, mere speculation is insufficient to establish prejudice. *See Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (speculating as to what expert would say is not enough to establish prejudice). Accordingly, Petitioner has not demonstrated that the PCR court's denial of this claim is contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

**C.    Counsel's Failure to Present a Coherent Closing Argument**

Petitioner argues that defense counsel rendered ineffective assistance because he confused the victims' names during closing argument (including misstating that Petitioner confessed to having consensual sex with SD). The PCR court rejected this claim, concluding that "[t]he jury was obviously not confused in any degree given the kind--types of verdicts that they returned." Resp't Ex. 119 at 54. Specifically, the jury acquitted Petitioner of the Rape in the First Degree and Coercion charges relating to AV, the older victim. The verdict suggests the jury credited Petitioner's defense that he did not forcibly rape or coerce AV. As the PCR court reasonably held, the record does not support a conclusion that defense counsel's mixup of the victims' names confused the jury as to the identity of the victim with whom Petitioner admitted having sex. Accordingly, Petitioner has not

Page 10 - FINDINGS AND RECOMMENDATION

demonstrated that there is a reasonable probability that, but for trial counsel's error, the result of the proceeding would have been different. The PCR court's denial of this claim is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

## II.    PROSECUTORIAL MISCONDUCT/BRADY VIOLATION

In Ground Two of Petitioner's Second Amended Petition, he alleges that "the prosecutor suborned perjury at his trial and failed to disclose exculpatory information as required under *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 514 U.S. 419 (1995)." Pet'r's Second Am. Pet. at 3. When originally pled, Petitioner premised this ground for relief on SD's recantation of her trial testimony. *See* Pet'r's Mem. in Supp. of Mot. for Leave to File Second Am. Pet. (ECF No. 67) at 2; Pet'r's Mem. in Supp. of Mot. to Stay (ECF No. 69) at 1. Petitioner exhausted this ground in his successive PCR proceeding and the court denied it on the merits. Currently, however, Petitioner also seeks to premise the claims on Officer Real's testimony at the successive PCR proceeding. This Court addresses Petitioner's contentions separately.[3]

### A.    Standards

A conviction obtained by a prosecutor's knowing use of false evidence violates the Fourteenth Amendment. *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1951). "Under this clearly established Supreme Court precedent, the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *Soto v. Ryan*, 760 F.3d 947, 958 (9th Cir. 2014).

---

[3] Petitioner did not move to amend his Second Amended Petition to add a ground for relief pertaining to Officer Real's PCR testimony. However, because Respondent does not challenge Petitioner's new reliance on Officer Real's testimony as not properly pled, this Court addresses the new allegations. *But see Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (traverse is not the proper pleading to raise additional grounds for relief).

Prosecutors are also constitutionally obligated to disclose evidence favorable to an accused

that is material either to guilt or to punishment. *Brady*, 373 U.S. at 87; *Kyles*, 514 U.S. at 432. In

order to succeed on a *Brady* claim, Petitioner must demonstrate that (1) the evidence is favorable,

either because it is exculpatory or impeaching; (2) the evidence was suppressed by the prosecution,

either willfully or inadvertently; and (3) the evidence is material to his guilt or innocence. *Shelton*

*v. Marshall*, 796 F.3d 1075, 1083-84 (9th Cir. 2015); *Comstock v. Humphries*, 786 F.3d 701, 708-10

(9th Cir. 2015).

**B.      SD's Recantation**

Approximately seven years after Petitioner's criminal trial, investigators Nash and Benson

interviewed SD. *See* Resp't Exs. 129 & 130. During the course of the lengthy interview, SD stated

that Petitioner did not rape or coerce her, and that she consented to the sexual contact. SD also stated

that 99% of her testimony was lies, her testimony outlining how the rapes occurred was "fed" to her

by AV, Officer Real switched her story, and Deputy District Attorney (DDA) John Mason told her

how to testify in order to convict Petitioner of the most serious charges. Resp't Ex. 129 at 3-8, 11,

17, 22, 24, 27-34, 36-37, 40-43, 46-47; Resp't Ex. 130 at 2-7. When questioned about her recent

drug rehabilitation treatment, SD stated that her recantation was her attempt to make amends for the

wrongs she's done in her life. Resp't Ex. 129 at 31; *see also* Resp't Ex. 134. Finally, SD stated that

Mason compiled a written summary of her taped interviews which she reviewed during trial

preparation. Resp't Ex. 129 at 34-36, 38.

In light of the foregoing facts, Petitioner alleged at his successive PCR proceeding that the

prosecutor (1) encouraged SD to make her testimony more inculpatory; (2) failed to disclose to the

defense that SD stated her sexual contact with Petitioner was consensual; and (3) failed to disclose

to the defense the written summary of SD's interviews used during trial preparation. *See* Resp't Ex.

Page 12 - FINDINGS AND RECOMMENDATION

126 at 2; Resp't Ex. 129 at 34-43; Resp't Ex. 139 at 5-8. Prior to the PCR hearing, the State deposed

DDA Mason and SD.

Mason testified that SD never gave a hint that she consented to the sexual contact with

Petitioner, he never asked SD to testify differently from her statements to him, and he did not create

a document summarizing SD's interviews to use during trial preparation. Resp't Ex. 138 at 16, 27-

35, 37-40, 48. When Mason was asked why SD would accuse him of doing so, he opined:

> A        * * * I do know that [SD] had experienced in the course of the trial
> tremendous pressure that she had expressed in terms of, ah, feeling intimidated by,
> not just by what the defendant said about harming her and her family, but she
> experienced pressures when she would go in and out of the courtroom with family
> members being in the hallway that would glare at her. They would make statements
> towards her.
>
> Q        Family members--
>
> A        Of the defendant. Things that would, you know, were very obviously
> taken as threats and intimidating for a young girl. And so I know there was lots of
> pressure on her.

*Id.* at 36.

At SD's PCR deposition, she testified under oath that her statements to investigators Nash

and Benson were false and that she testified truthfully at trial. SD testified that (1) Mason never told

her what to say or to provide false testimony; (2) she never told anyone that the sexual contact with

Petitioner was consensual; and (3) the document Mason showed her during trial preparation was

probably her grand jury testimony or her Child Advocacy Center interview. Resp't Ex. 137 at 3-4,

7-9, 11-16, 18-20, 57-63, 65-66. SD explained that her statements during the informal interview were

prompted by years of harassment by Petitioner's family:

> A        * * * I remember the interview and I remember what--I don't remember
> exactly everything I said. But I remember that I was just--I'm to the point
> now after being, you know, it's been eight years and I'm still being harassed
> and everything, that I just, I want it to be over.

Page 13 - FINDINGS AND RECOMMENDATION

Q    And did you feel that if you gave the statement that you gave to Harold Nash and Ron Benson that maybe the harassment would stop?

A    (Deponent nodded head).

* * * * *

Q    Before we took a break, [SD], you were indicating that your motivation for speaking with Ron Benson and Harold Nash in October of 2009 had been to try to stop the negative interactions that you were having with Mr. Fortin's family.

A    Yeah.

* * * * *

Q    Would your life be easier at this point if Mr. Fortin were not in prison?

A    It seems that way.

*Id.* at 55-56; *see also Id.* at 32, 34, 36-43, 58-59, 63-64, 73-74, 80-81.[4]

Petitioner's sister and ex-wife, however, attested that they did not threaten or influence SD to recant her trial testimony, and that SD initiated contact with them via the internet prior to the 2009 interview. Resp't Exs. 131-33. In a Myspace message, SD allegedly stated that she was "doing this because it's the right thing to do" and she "can't live another day of [her] life in a world of lies." Resp't Ex. 132 at 3.

The PCR Court denied relief, finding the deposition testimony of Mason to be credible:

2.    No proof of any Brady violation. When the complainant was speaking to the DDA, he gave her something to look at which contained some statements she had made. No proof that it wasn't one of the reports contained in discovery. DDA's testimony is that he didn't prepare any summary of her statements or anything else that he might have handed to her.

---

[4] When considering the influence of Petitioner's family, this Court notes that SD described Petitioner as a family friend, and SD's mother testified that she is married to Petitioner's mother's ex-husband. Tr. 97-98, 151.

Page 14 - FINDINGS AND RECOMMENDATION

3.      No proof of any prosecutorial misconduct. No proof that he told complainant to say anything other than the truth. He may have tried to get her to be more clear or provide more detail, but no proof he tried to get her to change her story or add anything untrue. (*But wouldn't be a basis for pcr even if proven.*)

4.      Complainant spoke to the police, to the forensic team, to the grand jury, the jury, the defense investigators and the pcr attorneys. The grand jury, the jury and the deposition in this case were all under oath. Those sworn statements were all consistent. The interview with the defense investigators was not sworn and is not consistent. There is no evidence that the trial attorney had any reason to believe that the witness would make a statement 8 years later that denied that her trial testimony was true. Even that statement is extremely incriminating for pet since she says the sexual contact was consensual. That is still incriminating on all of the counts in the indictment that plead an age factor rather than force. (This complainant is named in counts 1-10 and a different minor is named in counts 11-16). This court cannot think of anything the attorney should/could have done at trial concerning her testimony. Pet has proven inconsistent statements, but not perjury.

Resp't Ex. 141 at 2 (emphasis added).

The PCR court's conclusion that DDA Mason did not suborn perjured testimony from SB, or fail to disclose *Brady* material is neither contrary to, nor an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). Further, Petitioner has not demonstrated that it is based on an unreasonable determination of the facts based on the evidence presented. *See* 28 U.S.C. § 2254(d)(2). Petitioner points to no evidence that DDA Mason knew SD perjured herself at trial or that he created a document for SD's use during trial preparation. Accordingly, the PCR court's holding is entitled to deference, and habeas relief is not warranted. *See Lambert v. Blodgett*, 393 F.3d 943, 970 n. 16 (9th Cir. 2004) (petitioner bears burden of proving his case).

In so holding, I reject Petitioner's assertion that the PCR court "categorically exempt[ed]" his prosecutorial misconduct claim from review or otherwise denied Petitioner a full and fair hearing on the issue. The fact that the PCR court rendered alternative holdings, i.e., on the merits and on the basis that prosecutorial misconduct "wouldn't be a basis for pcr even if proven," does not negate the deferential standard of review accorded the decision. *Clabourne v. Ryan*, 745 F.3d 362, 383 (9th Cir.

Page 15 - FINDINGS AND RECOMMENDATION

2014), *overruled on other grounds*, *McKinney v. Ryan*, 813 F.3d 798, 818-19 (9th Cir. 2015); *Flores v. Long*, No. 13-0169-JGB, 2014 WL 2611278, at *5, n.6 (C.D. Cal. June 5, 2014); *Salas v. Biter*, No. 1:15-cv-00831-LJO-EPG-HC, 2015 WL 9583014, at *13-*14 (E.D. Cal. Dec. 31, 2015). Hence, Petitioner's assertion that the PCR court's holding on prosecutorial misconduct is *dicta* and not entitled to deference lacks merit.

Moreover, the deferential standard of review under § 2254(d) does not mandate a particular judicial process, nor does it authorize this Court to review the sufficiency of the PCR proceeding. *Barker v. Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005); *Lambert*, 393 F.3d at 965-66. Hence, Petitioner's assertion that the PCR court's decision is not entitled to deference because he did not receive a full and fair hearing lacks merit.

### C.    Officer Real's Testimony

Petitioner seeks to present new claims that the prosecutor knowingly influenced Officer Real to change his testimony and failed to disclose impeaching evidence, namely Mason's discussion with Officer Real concerning the accuracy of his police report. Pet'r's Br. in Supp. at 33. The factual background of these new claims is as follows.

Officer Real's incident report provides that SD stated that Petitioner raped her on October 11, 2001, and November 10, 2001. Resp't Ex. 112 at 7. The November 10, 2001 date is significant because it is Petitioner's ex-wife's birthday. Petitioner and several witnesses testified that Petitioner was in Salem that day celebrating her birthday. Tr. at 396-97, 401-02, 512. However, the importance of Petitioner's alibi was undercut by Officer Real's testimony that SD did not provide the dates that she was raped, and that he supplied the dates in his report because he thought it was necessary for the indictment:

Q      * * * When [SD] disclosed to you the two incidents where the defendant had raped her, did she know when this had occurred?

A    Not exactly. And i[f] you look at my report, that's a mistake on my part. What she had done is she said sometime within the second week of October and November. I asked her on or about the 10th or 11th, she said something like that. She never disclosed to me an exact date. However, in my report it does say 10-11-01 and 11-10-01.

Q    Okay. Why did you have dates down?

A    Well, at the time, I thought I needed a specific date for the charge. That was a mistake on my part, and I guess because of lack of experience for no other reason.

* * * * *

A.    * * * [S]he couldn't give a specific date, really, at any of the times. She gave a general date when she started babysitting, a general time frame a few months after she started, that the advances started with her.

*Id.* at 61-62. During cross and redirect examination, Officer Real reiterated that SD did not provide specific dates for the rapes, and that he chose the dates in his incident report. *Id.* at 62-65, 78, 84-85, 93-94, 448-49. When defense counsel asked Officer Real if he was changing the dates to "skirt the alibi defense," he responded adamantly:

A    First of all, I resent the fact that you're calling me a liar, sir.

Q    I know you do.

A    Second of all, that is not the fact. The fact of the matter is, and I'll explain it once again, when [SD] told me this happened, she said it happened the first part of the second week. I made the mistake--I did the wrong thing, I assumed dates. That's the fact.

*Id.* at 451-52.

At the successive PCR proceeding, however, Officer Real expressed doubt as to the accuracy of this testimony. After acknowledging that eleven years had past since he interviewed SD, Real testified that he believed he accurately wrote down dates that SD gave him. Resp't Ex. 140 at 35-41. Real testified that in a pretrial meeting with DDA Mason and SD, Mason told him that it appeared

he wrote the wrong dates in his report. *Id.* After that meeting, Real began to doubt whether his report

was accurate. *Id.* When asked why he did not testify to these facts at trial, Officer Real responded:

A     * * * So, when I did go to trial, I testified that, you know, it was possible that
      I had written the wrong date and that I may not have written the date that one
      of the incidents occurred.

Q     So, basically, they pressured you into changing your testimony about the date
      that something happened?

A     I-- I don't want to say pressured but they gave me enough doubt. You know,
      at the time, I was a young officer. I wasn't young in age. I was young in
      experience. And, you know, they--they gave me enough to think that I had
      possibly messed up that portion of the investigation.

                         * * * * *

Q     Have you thought about that issue in the--in the years that have passed?

A     * * * I would like to believe that I was not wrong, at the time. But, you know,
      when they talked to me, you know, the victim seemed pretty upset and, you
      know, I was a young officer and I wanted to man up if I made the mistake and
      say I made the mistake. But, after the discussion I had with [Chief District
      Attorney] Marsha Buckley, three or four months ago, I don't know if I did or
      not tell you the truth. I've wondered about it since.

                         * * * * *

Q     [Y]ou're testifying today that [SD] gave you a specific date for when she was
      raped, allegedly?

A     No, I'm testifying that at the time of trial, there was some doubt . . . . And
      now, I don't know. I'm not saying that date is right or wrong. I'm saying I do
      not know. Does that make sense, ma'am?

Q     But, in your--in your police report, you identified the specific dates. Where
      did those dates come from?

A     Those were taken from the interviews of the--of the people. From [SD].

Q     So [SD] told you those specific dates?

A     Yes.

Page 18 - FINDINGS AND RECOMMENDATION

Q    Okay. And so, when you testified that you just arbitrarily picked those two dates, was that true?

\* \* \* \* \*

A    I--I'm not sure. I can't tell you that. What I can tell you is, I wrote down--I believed I wrote down dates that I was told. I was called in for trial prep and I was told those were wrong. And, I--I don't--I'm not saying anybody pressured me or anything but I was led to believe I had screwed up the investigation.

\* \* \* \* \*

Q    Well then, why didn't you testify to that at trial?

A    Well, I thought I did.

Q    So, you don't recall telling the Defense Attorney that you plugged in an arbitrary date?

A    No, I really don't. I really don't. I don't have access to any of that. I really don't.

Q    And then, so do you recall testifying that [SD] did not actually give a specific date?

A    No, I really don't. I really don't. And, I'm not--you know, I really don't. When I was contacted for this, I tried to get copies of my reports and everything. And, that police department is gone. So, I couldn't get copies. So, I'm just trying to go off of however long ago this was.

*Id.* at 36-40.

In the instant proceeding, Petitioner concedes that his prosecutorial misconduct and *Brady* claims based on Officer Real's testimony are procedurally defaulted. Pet'r's Br. in Supp. at 30. Consequently, habeas relief is precluded absent a showing of cause and prejudice to excuse his procedural default, or that the failure to consider the defaulted claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Petitioner argues that (1) exhaustion is excused because raising his prosecutorial misconduct claim would have been futile; (2) his procedural default is excused because it was caused by ineffective assistance of PCR counsel;

Page 19 - FINDINGS AND RECOMMENDATION

and (3) he has made a colorable showing of actual innocence. Pet'r's Br. in Supp. at 30; Pet'r's Reply Br. (ECF No. 129) at 10-13.

### 1.   Futility

Petitioner argues that he did not procedurally default his prosecutorial misconduct claim because it would have been futile to raise the claim in the successive PCR proceeding in light of the PCR court's holding that prosecutorial misconduct "wouldn't be a basis for pcr even if proven." Pet'r's Br. in Supp. at 35-36. In *Smith v. Baldwin*, 510 F.3d 1127, 1138 (9th Cir. 2007), however, the Ninth Circuit stressed the difference between a failure to exhaust state remedies and procedural default, concluding that futility does not excuse a procedural default.

In *Smith*, the petitioner alleged that his procedural default of an actual innocence claim was excused because the state post-conviction court held that it could not grant post-conviction relief based on newly discovered evidence of actual innocence. Relying on 28 U.S.C. § 2254(b)(1)(B)(ii),[5] the petitioner argued that his failure to exhaust state remedies should be excused because the state PCR proceeding was ineffective to protect his rights. *Id.* The Ninth Circuit rejected the petitioner's assertion, holding that the absence of available state remedies does not excuse a procedural default:

> Smith needs no excuse from the exhaustion requirement because he has technically exhausted his state remedies through procedural default. * * * In cases such as this, where a petitioner did not properly exhaust state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," the petitioner's claim is procedurally defaulted. In light of the procedural bar to Smith returning to state court to exhaust his state remedies properly, the relevant question becomes whether Smith's procedural default can be excused, not whether Smith's failure to exhaust can be excused. Therefore, the exceptions to the exhaustion requirement set forth in § 2254(b) are irrelevant to Smith's petition. Rather, we must

---

[5] 28 U.S.C. § 2254(b)(1)(B)(i) & (ii) is the statutory equivalent to futility, providing that exhaustion is excused if "there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant."

determine whether we can excuse Smith's procedural default under the applicable exception to that rule.

*Id.* at 1139; *see also Pinnell v. Belleque*, 638 F.Supp.2d 1231, 1240 (D.Or. 2009); *Wahl v. Belleque*, No. 3:06-00810-KI, 2009 WL 690631, at *3 (D.Or. Mar. 5, 2009); *Remme v. Hill*, No. 1:07-cv-00273-PA, 2009 WL 723360, at *4 (D.Or. Mar. 13, 2009); *Perez v. Hill*, 3:06-cv-01805-HU, 2009 WL 2905576, at *5-*6 (D.Or. Sept. 3, 2009). In accord with the decision in *Smith*, the state PCR court's alternate holding that state post-conviction relief is not available for prosecutorial misconduct does not excuse Petitioner's procedural default. Rather, Petitioner must demonstrate cause and prejudice, or a color claim of actual innocence. *Smith*, 510 F.3d at 1139; *Coleman*, 501 U.S. at 750; *Pinnell*, 638 F.Supp.2d at 1241.

### 2.    Cause and Prejudice - Ineffective Assistance of PCR Counsel

Petitioner argues that the procedural default of his prosecutorial misconduct and *Brady* claims should be excused because it was caused by ineffective assistance of PCR counsel. Petitioner acknowledges, however, that the Ninth Circuit has held that ineffective assistance of PCR counsel does not excuse the procedural default of prosecutorial misconduct or *Brady* claims. *See Hunton v. Sinclair*, 732 F.3d 1124, 126-27 (9th Cir. 2013) (*construing Martinez v. Ryan*, 132 S.Ct. 1309 (2012)). Accordingly, pursuant to the holding in *Hunton*, Petitioner has not demonstrated cause to excuse his procedural default.

### 3.    Colorable Claim of Actual Innocence

Petitioner contends that the procedural default of his prosecutorial misconduct and *Brady* claims should be excused based on his colorable claim of actual innocence. Petitioner argues that his "actual innocence evidence falls into three main categories: SD's recantation, evidence that supports her recantation and undermines her proffered reasons for the later inconsistent statements

in her deposition, and Sergeant Real's post-conviction testimony regarding the date in his report." Pet'r's Br. in Supp. at 32.

A colorable claim of actual innocence serves as a gateway though which a petitioner may pass to overcome a procedural default. *Schlup v. Delo*, 513 U.S. 298, 315 (1995); *Stewart v. Cate*, 757 F.3d 929, 937 (9th Cir. 2014). "[T]enable actual-innocence gateway pleas are rare." *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1928 (2013); *Stewart*, 757 F.3d at 938. In order to make a colorable claim of actual innocence, Petitioner must present "new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Schlup*, 513 U.S. at 324; *Stewart*, 757 F.3d at 941. The new evidence must be so significant that when all of the evidence is viewed together, it becomes more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. *McQuiggin*, 133 S.Ct. at 1928; *Stewart*, 757 F.3d at 938.

"In conducting a *Schlup* gateway review, [this Court's] 'function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.'" *Stewart*, 757 F.3d at 938 (*quoting House v. Bell*, 547 U.S. 518, 538 (2006)); *see also Schlup*, 513 U.S. at 329 (actual innocence inquiry requires court "to make a probabilistic determination about what reasonable, properly instructed jurors would do."). This Court considers all the evidence, "old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (internal quotations omitted).

Petitioner has not met this demanding standard. SD testified consistently at trial and in her post-conviction deposition that Petitioner touched her breasts, tried to put his hands down her pants, and raped her on two occasions. Her sworn testimony is consistent with her statements to her mother,

Officer Real, DDA Mason, and to Social Worker Debra Faussett during a forensic interview. Additionally, SD testified at trial that she did not provide Officer Real specific dates when the rapes occurred. Tr. 102-24 & 130-32.

SD's recantation, in contrast, is an unsworn statement given to two investigators--neither of whom SD felt were "on her side." *See* Resp't Ex. 137 at 75. At the PCR proceeding, SD testified that she provided the inconsistent statements at the interview in order to stop years of harassment by Petitioner's family--a reasonable explanation corroborated by Defense Counsel Baldwin's observations of Petitioner's family pressuring SD outside the courtroom during trial. Moreover, as a general matter, recantation testimony is properly viewed with great suspicion, and it does not render the prior testimony false. *Jones v. Taylor*, 763 F.3d 1242, 1248 (9th Cir. 2014); *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir. 2004). Although Petitioner's sister and ex-wife attest that SD initiated the contact that resulted in her recantation interview, and deny threatening or influencing SD to make the statement, they did not deny engaging in the conduct that SD found to be harassing over the course of seven years between Petitioner's conviction and the interview.[6]

Even accepting SD's recantation as true, this Court cannot say that every reasonable juror would credit her recantation over her sworn testimony at trial and during the PCR proceeding. *See Jones*, 763 F.3d at 1250. Rather, in light of SD's testimony at trial and during the PCR proceeding, a reasonable juror could conclude that SD recanted her trial testimony due to harassment by Petitioner's family. *See Jones*, 763 F.3d at 1248, 1250 (witness' recantation considered in addition to his trial testimony and in the context in which he recanted when assessing the likely impact it would have on jurors.).

---

[6] Specifically, SD testified that Petitioner's sister called her names and "flipped' her off everytime she saw SD. Resp't Ex. 137 at 32, 34, 36-39, & 80. SD testified that Petitioner's ex-wife just glared at her. *Id.* at 64.

Page 23 - FINDINGS AND RECOMMENDATION

Moreover, Officer Real's PCR testimony concerning whether SD told him she was raped on November 10, 2001, is equivocal and his recollection dimmed by the passage of nine years since his interview of SD. The remote nature of Real's testimony is notable given his concession that he no longer remembered the substance of his trial testimony. In contrast, DDA Mason attested unequivocally during the first PCR proceeding that Officer Real told him that SD did not provide any specific dates:

> I asked officer Real if victim, [SD] had told him that the sex abuse and Rapes occurred on any specific calendar dates. Officer Real told me that the victims never gave him any specific dates. Officer Real further told me that this was his first sex crime investigation and he felt he needed to have a specific date for each charge. Officer Real told me he did not realize that a crime can be charged "on or about" or "on or between" certain dates. Officer Real told me that he tried to determine from victim [SD] the dates she normally babysat for the defendant and the time of the month in October of 2001 when she believed the last rape occurred before she quit babysitting for the defendant. Officer Real told me that he ultimately put down in his report a date in October and one in November that was approximately one month after the October date.

Resp't Ex. 117 at 2-3; *see also* Resp't Ex. 110 at 1 (3/27/02 forensic interview summary). A reasonable juror could conclude that DDA Mason's recollection is accurate. Even assuming that Officer Real testified correctly at the successive PCR proceeding that SD provided the November 10, 2001 date, a reasonable juror could conclude that given SD's age at the time of the offense and at trial, she simply provided Officer Real the wrong date.

In sum, in light of all the old and new evidence, including Petitioner's initial incriminating statements; SD's trial and PCR testimony; SD's recantation and statements to her mother and a social worker; Officer Real's trial and PCR testimony; the affidavits of Petitioner's sister and ex-wife; Petitioner's alibi evidence; and witness testimony that SD was not fearful of Petitioner, I conclude that Petitioner has not demonstrated that it is more likely than not that no reasonable juror

would have found him guilty. Accordingly, Petitioner has not made a colorable showing of actual innocence to excuse his procedural default.

### III. ACTUAL INNOCENCE

In Ground Three of his Second Amended Petition, Petitioner alleges that he is actually innocent of Counts 1 and 4 of the Indictment (Rape in the First Degree of SD). Pet'r's Second Am. Pet. at 4. Respondent moves the court to deny habeas relief on the basis that a freestanding claim of actual innocence is not cognizable in a habeas proceeding and, in any event, Petitioner has failed to demonstrate that he is actually innocent.

The Supreme Court has yet to hold that a freestanding claim of actual innocence is cognizable as an Eighth or Fourteenth Amendment claim in a federal habeas proceeding. *McQuiggin*, 133 S.Ct. at 1931; *House*, 547 U.S. at 554-55; *Jones*, 763 F.3d at 1246. However, on several occasions both the Supreme Court and the Ninth Circuit have assumed, without deciding, that such a claim may exist in capital cases. *House*, 547 U.S. 554-55; *Herrera v. Collins*, 506 U.S. 390, 417-19 & 427 (1993); *Jones*, 763 F.3d at 1246; *see also Roberts v. Howton*, 13 F.Supp.3d 1077, 1113 (D.Or. 2014) (collecting cases). In so doing, the courts have opined that a petitioner must "'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" *Jones*, 763 F.3d at 1246 (*quoting Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997)); *see also House*, 547 U.S. at 555 (Supreme Court precedent implies that freestanding claim of actual innocence requires more convincing proof of innocence than *Schlup*). The petitioner's burden under this standard is "extraordinarily high" and requires a showing that is "truly persuasive." *Carriger*, 132 F.3d at 476 (quoting *Herrera*, 506 U.S. at 417).

As discussed above, Petitioner has failed to make a colorable showing of actual innocence. For the same reasons, based on this Court's *de novo* assessment of the evidence, Petitioner has failed

to establish a freestanding claim of actual innocence. "The most that can be said of the new [evidence] is that it undercuts the evidence presented at trial. Evidence that merely undercuts trial testimony or casts doubt on the petitioner's guilt, but does not affirmatively prove innocence, is insufficient to merit relief on a freestanding claim of actual innocence." *Jones*, 763 F.3d at 1251.

## IV.    REQUEST FOR EVIDENTIARY HEARING AND DISCOVERY

Petitioner argues that adjudication of his actual innocence claim is premature, and that he should be afforded discovery under Rule 6, expansion of the record under Rule 7, and a federal evidentiary hearing, under Rule 8. Pet'r's Br. in Supp. at 38-39.[7] Petitioner reasons that a discovery and/or an evidentiary hearing is warranted because he did not fail to develop the factual basis of the claim in state court, the state PCR proceeding was not a full and fair hearing because it declined to consider his claim of actual innocence, and Petitioner has made a colorable claim of actual innocence.

In order to obtain discovery in a habeas corpus proceeding, the petitioner must demonstrate good cause. Rule 6(a), Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254. A habeas petitioner is entitled to an evidentiary hearing in district court, if he establishes a colorable claim for relief and he was not afforded a full and fair state hearing to develop his claim. *West v. Ryan*, 608 F.3d 477, 485 (9th Cir. 2010); *Earp v. Ornoski*, 431 F.3d 1158, 1167 (9th Cir. 2005); *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir.2005). "To allege a colorable claim, he must allege facts that, if true, would entitle him to habeas relief." *West*, 608 F.3d at 485; *Stokley v. Ryan*, 659 F.3d 802, 811 (9th Cir. 2011).

---

[7] Petitioner also seeks discovery and an evidentiary hearing on the merits of his prosecutorial claim relating to the testimony of Officer Real. As discussed in section II(B), however, that claim is procedurally defaulted, and Petitioner has not demonstrated that he was denied a full and fair hearing as to that claim.

Petitioner has failed to demonstrate that there is a factual dispute that, if decided in his favor, would present a colorable claim of actual innocence. Petitioner alleges that an evidentiary hearing is warranted because (1) DDA Mason and SD were never questioned under oath about Officer Real's testimony at the successive PCR proceeding; (2) Petitioner "could introduce the testimony of his sister and ex-wife regarding the MySpace messages that indicate SD initiated the recantation; testimony which could go beyond the scope of their affidavits;" and (3) Petitioner's sister could testify regarding the allegation that she made threats to SD. Pet'r's Reply at 7. Finally, Petitioner argues that "further discovery and a hearing would likely adduce additional facts." *Id.* at 7, n.1.

SD testified at trial that she did not provide specific dates that the rapes occurred to Officer Real. DDA Mason attested during the PCR proceeding that SD did not provide specific dates to Officer Real. Petitioner makes no showing that additional testimony on this point would produce anything more than what is already in the record. *See Griffin v. Johnson*, 350 F.3d 956, 966 (9th Cir. 2003) (denying evidentiary hearing because it would not produce evidence more reliable or more probative than the testimony and affidavits already presented). Further, assuming that Petitioner's sister would testify at an evidentiary hearing that she did not threaten SD, and that both Petitioner's sister and ex-wife would testify "beyond the scope of their affidavits" concerning whether SD initiated contact with them prior to her interview, those facts, when considered in light of the totality of the evidence before this Court, fall short of demonstrating a colorable claim of actual innocence. Accordingly, an evidentiary hearing is not warranted and Petitioner has not demonstrated good cause for additional discovery.

///

///

///

## CONCLUSION

Based on the foregoing, Petitioner's Second Amended Petition (ECF No. 92) should be denied, with prejudice. A Certificate of Appealability should be granted on Petitioner's Second and Third Grounds for Relief.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 16th day of May, 2016.

Paul Papak
United States Magistrate Judge